ROY A. KATRIEL (SBN 265463)
**THE KATRIEL LAW FIRM, P.C.**
1228 Camino del Mar
Del Mar, CA 92014
Telephone: (619) 363-3333
Facsimile: (866) 832-5852
Email: rak@katriellaw.com

RALPH B. KALFAYAN (SBN 133464)
Email: ralph@rbk-law.com
IAN D. KRUPAR (SBN 350391)
**THE KALFAYAN FIRM, A.P.C.**
1228 Camino del Mar
Del Mar, CA 92014
Telephone: (619) 232-0331
Facsimile: (619) 232-4019

*Counsel for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **RUBIN LAW OFFICE, P.C. Individually And On Behalf Of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**WEST PUBLISHING CORPORATION AND THOMSON REUTERS ENTERPRISE CENTRE GmbH,**<br><br>**Defendants.** | **No. __________________________**<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**<u>Jury Trial Demanded</u>** |

# CLASS ACTION COMPLAINT

1. Plaintiff Rubin Law Office, P.C. ("Plaintiff"), individually and on behalf of all other similarly situated Westlaw baseline digital legal research subscribers in the United States, brings this Class Action Complaint against Defendants West Publishing Corporation and Thomson Reuters Enterprise Centre GmbH (collectively, "Defendants" or "Westlaw/Thomson Reuters"), alleging violations of federal and state antitrust laws arising out of Defendants' anticompetitive, multi-million-dollar "killer acquisition" and subsequent systematic shutdown of its fastest-growing horizontal competitor, Casetext, Inc. ("Casetext").

## I. INTRODUCTION & SUMMARY OF THE ACTION

2. This case targets a classic technology sector "killer acquisition" executed by an entrenched duopolist with market power to suppress a disruptive upstart, eliminate downstream pricing discipline, and lock legal professionals into artificially inflated, supra-competitive pricing tiers.

3. Defendants' Westlaw product offering, alongside their primary legacy duopoly counterpart LexisNexis, have long dominated the premium digital legal research market in the United States. For decades, this duopoly leveraged its massive, highly insulated historical databases to extract immense, non-competitive subscription fees from law firms and solo practitioners nationwide.

4. In 2013, Casetext entered the market as a nimble, budget-conscious horizontal challenger. By offering a comprehensive, highly reliable federal and state case-law database at a fraction of the cost of the duopoly incumbents, Casetext established a vital competitive anchor. For solo practitioners and small law firms, Casetext provided a refuge from predatory legal tech pricing; for the broader legal market, Casetext's presence acted as a critical check on Westlaw's and Lexis's ability to unilaterally escalate subscription rates.

5. In early 2023, Casetext's market disruption accelerated exponentially. Armed with early, exclusive development access to OpenAI's foundational GPT-4 large language model, Casetext engineered and launched "CoCounsel"—the world's first generative AI legal

assistant.

6. On March 1, 2023, Casetext's co-founders, Jake Heller and Pablo Arredondo, officially launched CoCounsel on live, national television during an appearance on MSNBC's *Morning Joe*. The market response was instantaneous, overwhelming, and highly disruptive to the legacy legal tech architecture. Instead of navigating the traditional, months-long, single-librarian legal sales cycle, Casetext witnessed its enterprise demand multiply. Entire rooms of law firm partners assembled for immediate software demonstrations. Enterprise law firms rushed to purchase Casetext subscriptions on top of or in lieu of their existing platforms. Casetext's rate of market share growth and adoption velocity dramatically outpaced the stagnant, single-digit growth rates of Westlaw and LexisNexis.

7. Faced with immediate technological obsolescence and a profound threat to its structural market moat, Defendants did not compete on the merits. They did not spend the years or capital required to organically build a comparable large language model application layer. Instead, Defendants used their massive capital reserves to short-circuit the competitive process.

8. In June 2023, Thomson Reuters executed a definitive agreement to acquire Casetext for $650 million in cash—an extraordinary, highly inflated revenue multiple paid not for Casetext's modest existing revenue base, but to liquidate a nascent competitor and acquire its pathbreaking technology.

9. Following the acquisition, Defendants systematically executed their anticompetitive objective. Having successfully neutralized the independent threat, Defendants announced the complete shuttering and retirement of the standalone Casetext platform, which occurred on April 1, 2025.

10. The competitive fallout was immediate. Displaced, budget-conscious Casetext users were systematically forced onto Defendants' core ecosystem, where baseline subscriptions command a massive premium. Simultaneously, existing Westlaw subscribers were completely stripped of the competitive "Casetext alternative" leverage they historically weaponized to negotiate or suppress their Westlaw annual renewal escalators.

11. Plaintiff Rubin Law Office, P.C. represents the exact consumer demographic

caught in this anticompetitive vice. A subscriber to Casetext's budget-friendly basic plan since late September 2018 at approximately $32.50 per month based on an annual rate, Plaintiff was notified in March 2025 that its chosen platform was being eliminated by Thomson Reuters after Thomson Reuters acquired Casetext. Left with no viable, comprehensive independent alternatives, Plaintiff was forced to migrate to a Westlaw Classic three-year baseline contract at the drastically inflated rate of $111.48 per month—a sudden, out-of-pocket pricing surcharge of nearly 250% for standard case-law verification utilities. Worse yet, Westlaw Classic's rate offered to Plaintiff had a built-in increase the second year of four percent (4%) to $115.94 per month. The third-year rate had a built-in increase of four percent (4%) to $120.58 per month.

12. Plaintiff brings this action on behalf of a nationwide class of baseline Westlaw subscribers to remedy the ongoing financial overcharges, restore competitive pricing metrics, and challenge the unlawful consolidation of the digital legal research market. A baseline Westlaw subscription is one that affords access to Westlaw's legal research databases without providing access to Westlaw's separate AI-based legal platform, currently known as CoCounsel. Plaintiff asserts claims under Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and under the California Cartwright Act (on behalf of a California subclass defined below).

## II. <u>JURISDICTION AND VENUE</u>

13. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover treble damages, equitable relief, restitution, and reasonable attorneys' fees and costs for Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 7 of the Clayton Act (15 U.S.C. § 18).

14. This Court, therefore, has subject-matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331, 1337, and 15 U.S.C. §§ 15, 26. This Court has supplemental jurisdiction over the California Cartwright Act claims pursuant to 28 U.S.C. § 1367, as the state law claims arise out of the same common nucleus of operative facts as the federal claims.

15. This Court also independently has subject-matter jurisdiction under the Class

Action Fairness Act, 28 U.S.C. § 1332(d) because the nationwide class or California subclass is of diverse citizenship from Defendants West Publishing Corporation and Thomson Reuters Enterprise Centre GmbH, who are citizens of Minnesota and Switzerland, respectively, and the amount in controversy exceeds $5 million exclusive of interest and costs.

16. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d). Defendants are corporations that are licensed to do business, are doing business, have agents, and are found within this District. A substantial part of the interstate trade and commerce affected by the unlawful conduct described herein was carried out in this District. Furthermore, the targeted entity, Casetext, Inc., maintained its principal corporate headquarters in San Francisco, California, and substantial operations within this judicial district prior to its acquisition and subsequent dissolution by Defendants, such that the events giving rise to the claims asserted in this Class Action Complaint took place within this judicial district, the location of the then-headquarters of Casetext.

## III. <u>INTRADISTRICT ASSIGNMENT—DISTRICT-WIDE ASSIGNMENT UNDER GENERAL ORDER No. 44</u>.

17. As set forth in Paragraph 16, the events giving rise to this action arose primarily in San Francisco where Casetext was headquartered before the acquisition giving rise to the claims asserted in this Class Action Complaint. On this basis, assignment to the San Francisco or Oakland Divisions would be proper under Civil L.R. 3-2(d). Because this Class Action Complaint pleads antitrust claims, this Court's General Order No. 44 provides that the action shall be subject to districtwide assignment.

## IV. <u>PARTIES</u>

18. Plaintiff Rubin Law Office, P.C. is a California professional corporation with its principal place of business in Carlsbad, California. Plaintiff is a solo practitioner law firm. From late September 2018 through March 2025, Plaintiff maintained an active, baseline subscription to Casetext's standalone digital legal research database, for which it paid an annualized rate of approximately $32.50 per month. In March 2025, following Defendants' announcement that, following their acquisition of Casetext, the Casetext database would be

retired, Plaintiff was forced to secure an alternative comprehensive research database to maintain its practice. Plaintiff entered into a three-year baseline contract for Westlaw Classic, for which it has been and continues to be charged a supra-competitive rate of $111.48 per month. This rate was applicable for the first year of a three-year contract. The second-year rate had a built-in increase of four percent (4%) to $115.94 per month. The third-year rate had a built-in increase of four percent (4%) to $120.58 per month. Plaintiff has suffered direct financial injury-in-fact as a consequence of Defendants' overcharges and anticompetitive acquisition.

19. Defendant West Publishing Corporation is a Minnesota corporation with its principal place of business at 610 Opperman Drive, Eagan, Minnesota 55123. West Publishing Corporation is a wholly owned subsidiary of Thomson Reuters and actively markets, distributes, sells, and manages the Westlaw digital legal research platform to legal professionals, law firms, corporations, and government entities throughout California and the United States.

20. Defendant Thomson Reuters Enterprise Centre GmbH is a Swiss limited liability company with its principal place of business at Landis+Gyr-Strasse 3, 6300 Zug, Switzerland. This entity operates as a primary intellectual property, licensing, and operational hub for the broader Thomson Reuters corporate infrastructure, directly executing and holding structural control over the technology, corporate acquisitions, and high-level enterprise software distributions—including the Westlaw and CoCounsel product architectures—delivered into the United States and this District.

## V. FACTUAL ALLEGATIONS

### A. The Digital Legal Research Market and the Historical Westlaw/Lexis Duopoly

21. The practice of law in the United States requires comprehensive, daily access to primary legal authorities, including federal and state case law, statutes, administrative regulations, and court rules. To avoid professional malpractice, legal practitioners must utilize digital legal research databases that feature comprehensive coverage, updated indexing, and citation validation tools (such as determining whether a judicial opinion remains good law).

22. For decades, the market for Comprehensive Digital Legal Research Databases and Information Services has been locked in an insulated, highly concentrated duopoly dominated by Westlaw (owned by Thomson Reuters) and LexisNexis (owned by RELX). Together, these two entities historically controlled over 80% of the total revenue and market share for digital legal research services in the United States.

23. This duopoly structure created massive barriers to entry. The primary barriers include the immense capital cost required to digitize, cross-reference, and maintain millions of historical judicial opinions, alongside the proprietary indexing systems (such as Westlaw's Key Number System) and citation-checking moats (Westlaw's KeyCite and Lexis's Shepard's) that locked legal consumers into their respective ecosystems.

24. Leveraging this market concentration, Westlaw established a pattern of charging highly inflated, supra-competitive subscription fees. Standard baseline contracts frequently feature mandatory annual price escalators ranging from 3% to 7%, forcing law firms to pay hundreds or thousands of dollars per user, per month, for foundational data access.[1]

**B. Casetext's Entry and the Cultivation of Pricing Discipline**

25. In 2013, Casetext entered the marketplace as an independent, innovative disruptor designed to dismantle the duopoly's pricing premium. Over a decade of aggressive development, Casetext constructed a comprehensive public access case-law database covering all federal jurisdictions and all fifty states.

26. Casetext introduced unique predictive search utilities, including its "CARA AI" engine, which allowed attorneys to upload briefs and automatically find missing relevant authorities. Crucially, Casetext offered its comprehensive search tier at a highly disruptive, budget-friendly baseline price point, typically ranging from $65 to $110 per month (and as low as approximately $45 per month for early annual adopters like Plaintiff).

27. Casetext's existence introduced vital horizontal pricing discipline to the market. Small firms and solo practitioners utilized Casetext as their primary database to completely

---

[1] As noted in Paragraph 18 *supra*, Plaintiff's new contract with Westlaw included an annual four percent (4%) increase each year.

bypass the duopoly's high rates. Enterprise law firms utilized Casetext as an essential bargaining chip during multi-year Westlaw renewal negotiations, threatening to migrate portions of their research footprint to Casetext if Westlaw refused to lower its baseline pricing or grant custom retention discounts.

**C. The AI Paradigm Shift: CoCounsel and the *Morning Joe* Launch**

28. In late 2022 and early 2023, Casetext secured an extraordinary technological leapfrog advantage. Through an early, highly confidential development partnership with OpenAI, Casetext obtained backend access to the GPT-4 large language model architecture before it was released to the general public.

29. Casetext utilized this access to construct "CoCounsel," an advanced, generative AI application layer specifically trained on a vetted database of legal information. Unlike traditional predictive or extractive AI—which merely filtered database results based on boolean strings or metadata keywords—CoCounsel could actively perform sophisticated, multi-hour legal tasks in seconds, including drafting research memoranda, analyzing vast contract sets for compliance, and constructing deposition outlines.

30. On March 1, 2023, Casetext's co-founders formally announced and demonstrated CoCounsel to the nation on MSNBC's Morning Joe. Presenting the technology alongside practicing legal experts, the appearance demonstrated a historic paradigm shift: a legal AI capable of autonomously passing the Uniform Bar Exam and synthesizing complex litigation records in real-time.

31. The market response to the Morning Joe launch was immediate and unprecedented. Casetext's standard enterprise sales lifecycle multiplied. Law firms nationwide experienced an immediate surge in internal demand, with entire committees of partners assembling for immediate product acquisition.

32. Because Casetext was the first-mover and sole provider of a commercialized GPT-4 legal application layer, its rate of market share growth and subscription velocity spiked exponentially. Law firms that historically relied exclusively on Westlaw began buying

CoCounsel subscriptions *on top* of their legacy plans, establishing Casetext as an essential, high-utility gateway for legal technology.

**D. Thomson Reuters' "Killer Acquisition" and the Elimination of a Nascent Threat**

33. At the time of Casetext's post-launch surge, Westlaw's native capabilities were technologically lagging. Westlaw's existing flagship product, Westlaw Precision, relied strictly on older, manual categorization and extractive algorithms. Westlaw lacked any standalone or integrated generative AI capabilities capable of drafting text or conducting autonomous document reviews.

34. Recognizing that Casetext's explosive growth and technological lead threatened to completely commoditize Westlaw's core data moat and permanently shatter the historical duopoly structure, Thomson Reuters moved to neutralize the nascent competitor.

35. On June 26, 2023, Thomson Reuters announced a definitive agreement to acquire Casetext for $650 million in cash. At the time of the agreement, Casetext's actual annual recurring revenue (ARR) was estimated at roughly $10 million to $12 million. Thomson Reuters paid an extraordinary, economically irrational revenue multiple of over 50x ARR. This immense premium was not paid to capture Casetext's existing revenue flow; it was a strategic deployment of monopoly capital designed to buy out a structural threat and preempt a disruptive price and innovation war.

36. Having consolidated its control over Casetext, Thomson Reuters systematically executed its plan to eliminate the independent horizontal option. Instead of maintaining Casetext as an independent, budget-friendly competitor, Defendants absorbed CoCounsel's code, cross-licensed the technology into their premium tiers, and officially announced the complete shutdown and retirement of the standalone Casetext database platform, effective April 1, 2025.

**E. Direct Consumer Harm and Supra-Competitive Pricing Effects**

37. The destruction of Casetext directly inflicted severe antitrust injury upon legal consumers throughout the United States.

38. First, Defendants utilized the elimination of Casetext to force a predatory migration of budget-conscious users. When Casetext was retired, basic subscribers who relied on

its affordable database were cut off. To maintain their legal practices, thousands of solo practitioners and small firms were forced to purchase baseline plans from the remaining duopoly.

39. Plaintiff's experience directly quantifies this overcharge. Plaintiff was forced to transition from an annualized Casetext baseline rate of approximately $32.50 per month to a mandatory three-year Westlaw Classic baseline subscription costing $111.48 per month, with annual four percent (4%) increases. Plaintiff is trapped paying an immediate 243% (257% and 271% in later years) price premium for the same foundational database capability, with no lower-cost independent alternative left in the market.

40. Second, the acquisition triggered an industry-wide effect that harmed *all* baseline Westlaw subscribers, regardless of whether they had ever held a Casetext account. By permanently removing the independent Casetext alternative from the legal ecosystem, Westlaw eliminated the downstream contract-negotiation leverage and pricing discipline that historically suppressed Westlaw's standard contract rates. Free from the threat of user defection to Casetext, Westlaw has been empowered to maintain and escalate its standard baseline subscription fees at artificial, supra-competitive levels across its entire domestic customer base.

## VI. <u>RELEVANT MARKET ALLEGATIONS AND DEFENDANTS' MARKET POWER.</u>

### A. The Antitrust Product and Geographic Market Definition.

41. The relevant product market harmed by Defendants' conduct is the market for Comprehensive Digital Legal Research Databases and Information Services sold to legal professionals (the "Relevant Product Market").

42. The Relevant Product Market comprises digital databases containing comprehensive, cross-referenced collections of federal and state case law, statutes, constitutional provisions, administrative regulations, and court rules, paired with active citation-validation software mechanisms.

43. There are no reasonably interchangeable substitutes for the products within the Relevant Product Market. Under the Hypothetical Monopolist Test (HMT), a generic internet search engine (e.g., Google) or a generic consumer large language model application (e.g.,

standard ChatGPT) cannot substitute for the services within the market. Generic tools lack the verified, comprehensive, historical legal archives, structured indexing, and specialized precision required by legal professionals to satisfy their ethical obligations and avoid malpractice. Accordingly, a hypothetical monopolist controlling all products in the Relevant Product Market could profitably impose a Small but Significant and Non-Transitory Increase in Price ("SSNIP") of 5% to 10% without losing its customer base to any external alternative.

44. Prior to Casetext being acquired by Defendants, Casetext, Westlaw, and Lexis directly competed for the same end-users—lawyers, law firms, and corporate legal departments—by offering full access to primary law (federal and state case law, statutes, and regulations).

45. The relevant geographic market is the United States (the "Relevant Geographic Market"). Legal research databases sold to U.S. legal professionals must be tailored strictly to federal and state jurisdictions. Practitioners operating within the United States cannot substitute domestic legal research tools with foreign legal information services.

**B. Defendants' Dominant Monopoly Market Power Within The Relevant Market**

46. Defendants possess dominant monopoly market power within the Relevant Product Market. Operating within a tightly insulated legacy duopoly with LexisNexis, this duopoly market share concentration exceeds 80%. Nominally, Westlaw claims to have and have had a market share of approximately 40%, attributable to half of the duopoly's collective share. In fact, however, the reality of Westlaw's market power is that it possesses and has possessed a much higher true market power, giving the power of an actor with monopoly market power to raise prices and thwart competition. Defendants, in fact, exercised this monopoly market power repeatedly before the acquisition of Casetext, thus providing direct evidence of Defendants' monopoly market power.

47. The Westlaw-Lexis duopoly was so entrenched that it often was referred to as "Wexis" within the industry. Calculating Defendants' nominal market share by merely attributing to it approximately half of that duopoly's collectively market share vastly understates Defendants' dominant market power—the power to raise prices and exclude competition. This is

so because, inter alia, many of the customers of the Westlaw-Lexis duopoly purchased legal research database subscriptions from both Westlaw and Lexis. Indeed, all or nearly all AmLaw 100 and a vast majority of the AmLaw 500 law firms purchased both Westlaw and Lexis subscriptions. And all or nearly all U.S. ABA-accredited law schools provided both Westlaw and Lexis legal research database subscriptions to its professors and students. The net result is that a sale by one of the duopolists within the relevant market would not necessarily mean or even threaten a lost sale by the other.

48. This much was seen directly by repeated instances of Defendants' exercise of their monopoly market power. Long before Casetext's entry into the market in 2013, Westlaw (along with its duopoly partner, LexisNexis) systematically exercised its immense market power to enforce aggressive, lock-in pricing strategies. In the 5-year period preceding Casetext's entry into the market, for example, Westlaw's per-minute legal research charges routinely increased by as much as 33%, all without the loss of customer subscriptions. In 2008, the retail cost to search all federal cases on Westlaw Classic was $113.00 per search, or $15.33 per minute. Just two years later, in 2010, the per-minute rate to view all federal cases rose to $19.05 per minute. By 2014, Westlaw retail rates eventually reached $20.00 per minute just to view a single judicial opinion or federal statute.

49. But Defendants' exercise of their dominant or monopoly pricing market power was not limited to just rate increases. For flat-fee firm subscriptions, Westlaw leveraged its market power through restrictive contract structures. Firms were channeled into three-year commitments (as Plaintiff's own Westlaw subscription history exemplifies). If a small firm tried to opt for a shorter one- or two-year subscription, Westlaw charged drastically higher monthly baselines and tacked on steep built-in annual percentage increases for consecutive years.

50. Because Westlaw and LexisNexis controlled 80% or more of the legal information market, the lack of competitive pressure allowed Westlaw to keep monthly costs extraordinarily high—often demanding hundreds to thousands of dollars per month even for small practices to access basic public records.

51. When Casetext initially emerged in 2013, it intentionally disrupted this dynamic by offering flat, transparent pricing ($65 to $99 per month or even less) without long-term commitments. And when Casetext, capitalized on its early access to Open AI, and debuted its CoCounsel AI-based legal platform in a manner that exponentially increased its market share, to include both large and small law firms, that sharpened the economic and market threat that Casetext posed to Defendants and their heretofore entrenched Westlaw product. That is when Defendants decided to act by way of an anticompetitive acquisition that killed off this nascent and market-disruptive competitor.

## VII. <u>CLASS ACTION ALLEGATIONS</u>

52. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of itself and a nationwide class (the "Nationwide Class") defined as follows:

**The Nationwide Class:** Subject to the exclusion set forth in Paragraph 54 *infra*, all individuals, solo practitioners, and law firms in the United States who maintained an active subscription to a baseline Thomson Reuters Westlaw digital legal research plan (including but not limited to Westlaw Classic or Westlaw Edge) at any time from June 26, 2023 through the present, without adding on premium generative AI or CoCounsel application tiers. A "baseline" subscription digital legal plan entails a legal research plan that provides access to legal databases but does not include a separate AI-related or assisted component for tasks like document review, legal drafting, deposition summary, etc.

53. Plaintiff additionally brings this action on behalf of a localized California subclass (the "California Subclass") defined as follows:

**The California Subclass:** Subject to the exclusion set forth in Paragraph 54 *infra*, all individuals, solo practitioners, and law firms with a principal place of business in the State of California who maintained an active subscription to a baseline Thomson Reuters Westlaw digital legal research plan (including but not limited to Westlaw Classic or Westlaw Edge) at any time from June 26, 2023 through the present, without adding on premium generative AI or CoCounsel application tiers.

54. Excluded from the Nationwide Class and the California Subclass are Defendants; their officers, directors, management, employees, subsidiaries, and affiliates; any entity that voluntarily upgraded to premium integrated CoCounsel/Westlaw Precision AI bundles; and any judicial officer presiding over this action.

55. Numerosity (FRCP 23(a)(1)): The members of the Nationwide Class and the California Subclass are so numerous that joinder of all members is impracticable. There are tens of thousands of solo practitioners and law firms across the United States and California who maintain baseline Westlaw subscriptions. The precise identities of all class members are readily ascertainable through Defendants' internal customer billing databases and subscription records.

56. Commonality (FRCP 23(a)(2)): There are numerous questions of law and fact common to the Class, which predominate over any questions affecting only individual members. These common questions include:

a. Whether Defendants' acquisition of Casetext violated Section 7 of the Clayton Act;

b. Whether Defendants engaged in an unlawful restraint of trade under Section 1 of the Sherman Act;

c. Whether Defendants unlawfully maintained monopoly power in the Relevant Product Market under Section 2 of the Sherman Act;

d. Whether Defendants' acquisition and subsequent shutdown of Casetext caused baseline Westlaw subscription prices to be maintained at artificial, supra-competitive levels;

e. Whether the California Subclass is entitled to damages and injunctive relief under the Cartwright Act; and

f. The proper economic methodology for measuring the class-wide overcharge damages.

57. Typicality (FRCP 23(a)(3)): Plaintiff's claims are entirely typical of the claims of the Class. Plaintiff is a baseline Westlaw subscriber who pays a monthly subscription fee that has been artificially inflated and maintained at a supra-competitive level because Defendants

eliminated their primary independent horizontal competitor. Plaintiff's interests are perfectly aligned with the interests of all other class members.

58. Adequacy (FRCP 23(a)(4)): Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel highly experienced in complex antitrust and class-action litigation. Plaintiff has no interests that conflict with or are antagonistic to the interests of the Class.

59. Predominance and Superiority (FRCP 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the financial injury suffered by an individual solo practitioner or small law firm is modest relative to the immense cost of prosecuting a complex federal antitrust lawsuit against multinational corporations, individual litigation is economically unfeasible. Class-wide adjudication presents substantial economies of scale, avoids inconsistent judgments, and provides a unified mechanism to remedy systemic market overcharges.

## VIII. CLAIMS FOR RELIEF

### COUNT I

Unlawful Contract, Combination, or Conspiracy in Restraint of Trade
Sherman Act § 1 (15 U.S.C. § 1)

(Against All Defendants on Behalf of the Nationwide Class)

60. Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if fully set forth herein.

61. Prior to June 2023, Thomson Reuters and Casetext operated as separate, independent corporate entities actively competing as horizontal rivals within the Relevant Product Market in the United States.

62. In June 2023, Defendants and Casetext entered into a definitive acquisition agreement, contract, and combination whereby Thomson Reuters acquired 100% of Casetext's corporate assets and intellectual property for $650 million in cash. Part of that agreement included the understanding that Defendants would eliminate Casetext from the market, which Defendants did following their acquisition of Casetext.

63. This agreement constituted an unreasonable and unlawful horizontal restraint of trade within the Relevant Product Market. The express purpose and predictable economic effect of the agreement were to completely eliminate independent horizontal competition, liquidate a low-cost market alternative, absorb breakthrough AI technologies to prevent market-wide price disruption, and insulate Defendants' premium pricing tiers.

64. As a direct and proximate result of this contract, combination, and restraint of trade, competition within the Relevant Product Market has been severely restricted, and baseline Westlaw subscription rates have been maintained at artificial, supra-competitive levels. Plaintiff and the Nationwide Class have suffered antitrust injury in the form of direct out-of-pocket financial overcharges.

**COUNT II**
Unlawful Maintenance of Monopoly Power
Sherman Act § 2 (15 U.S.C. § 2)

(Against All Defendants on Behalf of the Nationwide Class)

65. Plaintiff incorporates and re-alleges every allegation set forth in paragraphs 1-59 as if fully set forth herein.

66. Defendants possess dominant monopoly market power within the Relevant Product Market in the United States, maintaining a structural market share and duopoly concentration capable of controlling prices and excluding competition.

67. Defendants have willfully, knowingly, and intentionally maintained their monopoly power through exclusionary, predatory, and anticompetitive conduct, rather than through growth or development as a consequence of a superior product, business acumen, or historic accident.

68. Defendants' exclusionary conduct consists of executing a predatory "killer acquisition" of its fastest-growing, technologically superior nascent competitor, Casetext, and subsequently shuttering the independent Casetext database platform on April 1, 2025. This conduct was specifically designed to foreclose competition, eliminate downstream pricing

discipline, destroy a budget-friendly market alternative, and prevent the natural commoditization of baseline digital legal research tools.

69. As a direct and proximate result of Defendants' monopolistic behavior, entry barriers have been enhanced, horizontal competition has been suppressed, and Plaintiff and the Nationwide Class have been forced to pay inflated, supra-competitive baseline subscription prices.

**COUNT III**
Anticompetitive Acquisition
Clayton Act § 7 (15 U.S.C. § 18)

(Against All Defendants on Behalf of the Nationwide Class)

70. Plaintiff incorporates and re-alleges every allegation set forth in paragraphs 1-59 as if fully set forth herein.

71. Defendants are corporations engaged in interstate commerce and in activities affecting interstate commerce within the meaning of the Clayton Act.

72. Defendants' acquisition of the stock and assets of Casetext, Inc. in June 2023 constitutes an acquisition subject to Section 7 of the Clayton Act.

73. The effect of this acquisition has been, is, and will continue to be to substantially lessen competition, or tend to create a monopoly, within the Relevant Product Market and the Relevant Geographic Market. Specifically, the merger:

a. Eliminated actual, direct, and aggressive horizontal competition between Westlaw and Casetext;

b. Eliminated an essential independent nascent competitor that was experiencing exponential market adoption;

c. Drastically increased concentration metrics within an already highly concentrated duopoly market; and

d. Prevented downstream legal consumers from benefiting from a multi-firm innovation and price war in legal software.

74. Plaintiff and members of the Nationwide Class have sustained direct, measurable financial injury as a proximate result of this unlawful merger, facing an ongoing lack of consumer choice and sustained supra-competitive subscription fees.

**COUNT IV**
Violations of the Cartwright Act
California Business & Professions Code § 16720 et seq.

(Against All Defendants on Behalf of the California Subclass)

75. Plaintiff incorporates and re-alleges every allegation set forth in paragraphs 1-59 as if fully set forth herein.

76. Defendants and Casetext entered into a contract, combination, and conspiracy that created an unlawful trust and restriction in trade within the State of California, in violation of California Business and Professions Code § 16720 et seq.

77. The targeted entity, Casetext, maintained its corporate headquarters and primary operations within the State of California prior to the merger, and a substantial portion of the suppressed horizontal competition occurred directly within the California legal market.

78. Under the Cartwright Act, combinations of capital designed to limit or reduce the production of a commodity, prevent competition, or fix prices at a standard premium are strictly illegal *per se* or constitute an unreasonable restraint of trade under a rule of reason analysis.

79. Defendants' acquisition and subsequent liquidation of the California-headquartered Casetext platform successfully prevented competition, restricted the independent availability of comprehensive digital legal research tools, and permitted Defendants to maintain baseline subscription prices for California attorneys at artificial, supra-competitive levels.

80. Plaintiff and members of the California Subclass have suffered direct antitrust injury and out-of-pocket damages within the State of California, entitling them to treble damages, injunctive relief, and reasonable attorneys' fees pursuant to California Business and Professions Code § 16750.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Nationwide Class and the California Subclass, respectfully prays for judgment against Defendants as follows:

A. An Order certifying the Nationwide Class and the California Subclass under Federal Rule of Civil Procedure 23, appointing Plaintiff Rubin Law Office, P.C. as Class Representative, and appointing Plaintiff's underlying counsel as Class Counsel;

B. A Declaration and Judgment that Defendants' acquisition and subsequent shutdown of Casetext constitutes a violation of Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and the California Cartwright Act;

C. An award of compensatory, overcharge damages sustained by Plaintiff and the classes, to be trebled automatically pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) and California Business and Professions Code § 16750, as part of a common fund from which this award of damages can be paid to each of the class and subclass members;

D. An Order granting appropriate equitable and structural injunctive relief, including but not limited to, ordering Thomson Reuters to divest, spin out, or re-establish Casetext and CoCounsel as an independent, standalone corporate competitor, or enjoining Westlaw from enforcing mandatory annual price escalators against baseline subscribers;

E. An award of pre-judgment and post-judgment interest at the maximum legal rate;

F. An award of reasonable attorneys' fees, expert witness fees, and litigation costs; and

G. Such other and further relief as this Court deems just, proper, and equitable under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated this 1st day of October 2026,

Respectfully submitted,

/s/ Roy A. Katriel
ROY A. KATRIEL (265463)
THE KATRIEL LAW FIRM, P.C.
1228 Camino del Mar
Del Mar, CA 92014
Telephone: (619) 363-3333
Facsimile: (866) 832-5852
Email: rak@katriellaw.com

RALPH B. KALFAYAN (SBN 133464)
Email: ralph@rbk-law.com
IAN D. KRUPAR (SBN 350391)
**THE KALFAYAN FIRM, A.P.C.**
1228 Camino del Mar
Del Mar, CA 92014
Telephone: (619) 232-0331
Facsimile: (619) 232-4019

*Counsel for Plaintiff and the Putative Class*